(Slip Opinion)

# Executive Branch Participation in the Cyberspace Solarium Commission

In our tripartite constitutional structure, any commission performing federal functions must reside within a single one of the three branches of government.

The Cyberspace Solarium Commission is properly viewed as a Legislative Branch entity, because congressional appointees compose the majority of the Commission's membership, the Commission exercises the investigative authorities of a congressional committee, and the Commission's ultimate mission is to advise Congress.

The Executive Branch officials serving on the Commission should act with one unified voice, subject to executive supervision, in advising the Commission and should maintain the confidentiality of Executive Branch information when sharing their information and expertise with the Commission.

October 9, 2020

MEMORANDUM OPINION FOR THE LEGAL ADVISOR
NATIONAL SECURITY COUNCIL

The John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, 132 Stat. 1636 (2018) ("FY 2019 NDAA"), created the Cyberspace Solarium Commission ("Commission") to "develop a consensus on a strategic approach to defending the United States . . . against cyber attacks." *Id.* § 1652(a)(1), 132 Stat. at 2140–41. The fourteen-member Commission consisted of representatives from both the Legislative Branch and the Executive Branch: four senior Executive Branch officers who served ex officio and ten appointees from Congress. *Id.* § 1652(b)(1)(A), 132 Stat. at 2141. The Commission was required to provide a report to Congress with recommendations related to the proper "core objectives" for cyber defense and to "various strategic options to defend the United States."[1] *Id.* § 1652(f)(1)–(2), (k)(1), 132 Stat. at 2142, 2146. The Director of National Intelligence ("DNI"), Secretary of Defense, and Secretary of Homeland Security were then required to provide their assessment of the report within 60 days of receiving it. *Id.* § 1652(*l*), 132 Stat. at 2146.

---

[1] The Commission publicly released the report on March 11, 2020, but was not required by statute to formally submit the report to Congress until April 30. *See* Cyberspace Solarium Commission, Final Report (Mar. 2020), https://www.solarium.gov/report.

The structure of the Commission raised a number of questions under the constitutional separation of powers, which bore upon whether and how the Executive Branch members of the Commission could participate in its work. This memorandum memorializes this Office's oral advice provided to the Executive Branch members of the Commission, regarding the organization of the Commission's operations, votes by Executive Branch officials about the Commission's business, and the Executive Branch contributions to the Commission's final report.

Commissions with members appointed by both the Legislative and Executive Branches have been established on many prior occasions, but the Executive Branch has long recognized that such "hybrid" commissions present constitutional concerns.[2] Although these commissions may lawfully exercise advisory functions, where they exercise the authority of the government, they must do so within the confines of the Constitution's tripartite structure and reside in one branch. Here, congressional appointees composed the majority of the Commission's membership, the Commission exercised the investigative authorities of a congressional committee, and the Commission's ultimate mission was to advise Congress. The Commission thus was properly viewed as a Legislative Branch entity.

---

[2] *See, e.g.*, *Statement on Signing the Bill Establishing a Commission on the Bicentennial of the United States Constitution* (Sept. 29, 1983), 2 Pub. Papers of Pres. Ronald Reagan 1390 (1983) ("[B]ecause of the constitutional impediments contained in the doctrine of the separation of powers, I understand" that the Chief Justice and the congressional members of the bicentennial commission "will be able to participate only in ceremonial or advisory functions of the Commission, and not in matters involving the administration of the act."); *Constitutionality of Resolution Establishing United States New York World's Fair Commission*, 39 Op. Att'y Gen. 61, 62 (1937) (Cummings, Att'y Gen.) (objecting to a congressional commissioner that would plan and appoint commissioners for the New York World's Fair as "amount[ing] to an unconstitutional invasion of the province of the Executive"); *Participation of Members of Congress in the Ronald Reagan Centennial Commission*, 33 Op. O.L.C. 193, 195 (2009) ("*Ronald Reagan Commission*") (identifying constitutional concerns with commissions with members from multiple branches engaging in responsibilities that "extend beyond providing advice or recommendations . . . or participating in ceremonial activities"); Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Incursions into Areas of Executive Responsibility* at 3–4 (Oct. 31, 1984) ("*Congressional Incursions*") (describing the Department's repeated "strong[]" opposition to congressional creation of commissions with legislative and executive branch appointees as "inconsistent with the tripartite system of government established by the Framers of our Constitution" (internal quotation marks omitted)).

We recognized that the Commission, as a Legislative Branch entity, could benefit from participation of its Executive Branch members, but we advised that those members should carry out their advisory functions not as free agents, but as executive officers subject to supervision by their departments, and ultimately, the President. Because the Commission's Executive Branch members represent the interests of the Executive Branch in performing their work, we advised that they should not provide independent statements in assessing the Commission's work and that the commission members should not vote individually on the Commission's final report or any of its subpoenas. The Commission's report and its subpoenas were the official actions of a Legislative Branch entity. While the Executive Branch members could, in principle, have adopted and advanced common positions on those actions, the Commission's procedures and the need to release its report promptly made it impracticable for them to do so. We therefore advised the Executive Branch officials not to vote, consistent with their accountability to the Executive Branch.

We further construed statutory provisions providing for the Executive Branch to provide staff and office space to the Commission to be discretionary, rather than mandatory, because the separation of powers imposes constraints upon Congress's ability to enlist the Executive's staff and physical resources. Finally, we advised that the Commission's Executive Branch members and staff were obliged to preserve Executive Branch confidentiality interests. We explained that they should evaluate requests for information in light of the accommodation principles at play when congressional committees request information and support from the Executive Branch, and in light of any executive privilege concerns, particularly given the classified nature of some of the Commission's work, *see* FY 2019 NDAA § 1652(g)(3)(C), 132 Stat. at 2144. *See, e.g.*, *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977) (requiring each branch to "seek optimal accommodation through a realistic evaluation of [their respective] needs . . . in the particular fact situation"). Such obligations, however, do not mean that the Executive Branch officers could not accommodate the Commission's legitimate interests in that regard, consistent with the assistance regularly provided by the Executive Branch to Congress.

## I.

The FY 2019 NDAA established the Cyberspace Solarium Commission to gather evidence and prepare a report recommending a long-term strategy for defense against cyber attacks. *Id.* § 1652(a)(1), (f)(1)–(7), (k)(1), 132 Stat. at 2141–43, 2146. The Commission was modeled on President Dwight D. Eisenhower's Cold War-era "Project Solarium," which gathered three task forces of experts from public and private life to study strategies for guarding against a potential stockpiling of atomic weapons by the Soviet Union.[3]

Congress directed the Cyberspace Solarium Commission "[t]o define the core objectives and priorities" of a national cyber-defense strategy, "weigh the costs and benefits of various strategic options," "evaluate the effectiveness of the current national cyber policy," and "consider possible structures and authorities that need to be established, revised, or augmented within the Federal Government" to successfully guard against cyber attacks. FY 2019 NDAA § 1652(f), 132 Stat. at 2142–43. By statute, the Commission's fourteen members included the Principal Deputy DNI, the Deputy Secretary of Homeland Security, the Deputy Secretary of Defense, the Director of the Federal Bureau of Investigation, and ten congressional appointees who could be members of Congress. *Id.* § 1652(a)(1)–(2), (b)(1), 132 Stat. at 2141. On some prior occasions, Congress at least purported to specify whether a hybrid commission of this sort should be considered legislative or executive.[4] But it did not do so here.

---

[3] *See* 164 Cong. Rec. S3927 (daily ed. June 13, 2018) (statement of Sen. Sasse, who had originally proposed an amendment to the FY2018 NDAA that would have created the Cyberspace Solarium Commission, *see* 163 Cong. Rec. S5674 (daily ed. Sept. 13, 2017)); *see also* Memorandum of Discussion at the 144th Meeting of the National Security Council, Wednesday, May 13, 1953, *in* Dep't of State Pub. No. 9347, 15 *Foreign Relations of the United States, 1952–1954 (Korea)* 1012, 1016 (1984) (describing statement of President Eisenhower explaining the objectives of Project Solarium). President Eisenhower named the project after the White House solarium, where the idea was conceived. *See* William B. Pickett, *Introduction: The Solarium Exercise of June 1953*, *in* George F. Kennan and the Origins of Eisenhower's New Look: An Oral History of Project Solarium 3 (William B. Pickett ed., 2004).

[4] *See, e.g.*, FY 2019 NDAA § 1051(a)(1)–(4), (b), 132 Stat. at 1962–63 (establishing an advisory commission "in the executive branch" with legislative and executive appointees to produce reports and recommendations on the national security uses of artificial intelligence and machine learning); Evidence-Based Policymaking Commission Act of

To carry out its mission, the Commission was authorized to exercise investigative functions. The Commission was able to hold hearings, take testimony, receive evidence, and issue subpoenas requiring witness testimony and document production. *Id.* § 1652(g)(1)(A), 132 Stat. at 2143; *see also id.* § 1652(g)(1)(B), 132 Stat. at 2143. The statutes governing contempt of Congress were made applicable to failures to comply with the Commission's subpoenas. *Id.* § 1652(g)(1)(C), 132 Stat. at 2143. Separately, executive agencies were instructed, "to the extent authorized by law, [to] furnish such information, suggestions, estimates, and statistics" as are required for the Commission to carry out its duties. *See id.* § 1652(g)(3)(A)–(B), 132 Stat. at 2143–44; *see also, e.g.*, *id.* § 1652(g)(1)(A), 132 Stat. at 2143 (authorizing the Commission, "for the purpose of carrying out the provisions of this section," to require by subpoena testimony, books, records, correspondence, and documents as the Commission or "designated subcommittee or designated member considers necessary"). In addition, the statute specified that the Secretary of Defense "shall" provide the Commission with nonreimbursable administrative services, funds, staff, and facilities, *id.* § 1652(g)(4)(A), 132 Stat. at 2144, and that the DNI and the heads of other executive agencies "may" give the Commission administrative services and staff, *id.* § 1652(g)(4)(B), (C), 132 Stat. at 2144. *See also id.* § 1652(h)(1)(B), 132 Stat. at 2144 (authorizing the detailing of federal staff to the Commission).

The Commission was required to memorialize its recommendations in a "final report" to the congressional defense, intelligence, and homeland security committees, as well as to the Secretary of Defense, the Secretary of Homeland Security, and the DNI. *Id.* § 1652(k)(1), 132 Stat. at 2146. Within 60 days of receiving the report, the Secretaries and the DNI were each to "submit to the congressional intelligence committees and the

---

2016, Pub. L. No. 114-140, §§ 2, 3(a), 4, 130 Stat. 317, 317–18 (2016) (establishing an advisory commission "in the executive branch" with legislative and executive appointees to produce recommendations for amending federal agency data infrastructure, database security, and statistical protocols); *see also* Matthew E. Glassman & Jacob R. Straus, Cong. Research Serv., R40076, *Congressional Commissions: Overview, Structure, and Legislative Considerations* 10 (2017) ("In some instances, the establishment clause will identify the commission as 'established in the legislative branch.'").

congressional defense committees an assessment" of the report, including "such comments" as each of the three officials "considers appropriate." *Id.* § 1652(*l*), 132 Stat. at 2146. The original deadline for the report was September 1, 2019, *see id.* § 1652(k)(1), 132 Stat. at 2146, but Congress extended the deadline to April 30, 2020. National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 1639, 133 Stat. 1198, 1750 (2019). On March 11, 2020, the Commission made the report available to the public, in anticipation of its formal submission to Congress in April. *See* Cyberspace Solarium Commission, Final Report (Mar. 2020), https://www.solarium.gov (last visited Oct. 9, 2020). The Commission was to terminate within 120 days of the report's formal submission to the congressional defense and intelligence committees. *See* FY 2019 NDAA § 1652(k)(2)(A), 132 Stat. at 2146. During that 120-day period, the Commission was able to wind down its activities and provide testimony to Congress on its report. *Id.* § 1652(k)(2)(B), 132 Stat. at 2146.

## II.

A truly hybrid commission with Executive and Legislative Branch appointees creates separation of powers concerns because it lacks accountability to any single branch of government. As the Supreme Court has recognized, "[t]he Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see also, e.g.*, *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 329 (1816) ("The object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments."); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.* (1792) (reporting the decision of the Circuit Court for the District of New York, including Chief Justice Jay and Justice Cushing, which had observed "[t]hat by the Constitution of the United States, the government thereof is divided into *three* distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either" (emphasis added)). In our tripartite constitutional structure, any commission performing federal functions must reside within a single one of the three branches of government.

## A.

This Office has long expressed constitutional concerns about hybrid commissions, which occupy a "no-man's land between . . . two branches," with commission members who risk being unaccountable to either of the political branches. Memorandum for John R. Bolton, Assistant Attorney General, Office of Legislative and Intergovernmental Affairs, from Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 3345, 99th Cong. 1st Sess.*, at 2 (Apr. 9, 1986); *see also Congressional Incursions* at 3–4 (describing such commissions as "inconsistent with the tripartite system of government established by the Framers of our Constitution" and detailing the Department's repeated "strong[]" opposition to congressional creation of hybrid commissions (internal quotation marks omitted)).[5]

The problems with hybrid commissions are two-fold. First, an entity with members representing two branches is not fully accountable to any governmental authority. The constitutional separation of powers is designed to diffuse power among different federal actors to better protect liberty. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (recognizing that the "purpose of separating and dividing the powers of government" was to "'diffus[e] power the better to secure liberty'" (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring))). But "[t]he diffusion of power carries with it a diffusion of accountability." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010). To ensure that the government remains responsive to the people, the constitutional separation of powers "requires that each branch maintain its separate identity, and that functions and responsibilities be clearly assigned among the separate branches, so that each can be held accountable for its actions." Memorandum for William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, from Ralph W. Tarr, Acting Assistant Attor-

---

[5] *See, e.g.*, *Statement on Signing a Bill Establishing a National Commission on Agricultural Trade and Export Policy* (Aug. 30, 1984), 2 Pub. Papers of Pres. Ronald Reagan 1211, 1211–12 (1984) (urging that the commission "be composed either entirely of members selected by the legislative branch, if it is to serve primarily legislative functions, or entirely of members appointed by the President, if it is to serve the executive branch"); *Statement on Signing the Patent Law Amendments Act of 1984* (Nov. 9, 1984), 2 Pub. Papers of Ronald Reagan 1816, 1817 (1984) (same).

ney General, Office of Legal Counsel, *Re: S. 519, 99th Cong. 1st Sess., the "Federal Employee Anti-Sex Discrimination in Compensation Act of 1985"* at 2 (July 2, 1985).

"The creation of a Commission that is not clearly legislative, judicial, or executive, tends to erode" this foundational restraint. *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 251 (1989) ("*Common Legislative Encroachments*") (internal quotation marks omitted). When a blended executive-legislative body ultimately reports to neither political branch, the public is left unable to determine where the blame for "a pernicious measure . . . ought really to fall." *See Free Enter. Fund*, 561 U.S. at 498 (internal quotation marks omitted) (quoting *The Federalist* No. 70, at 476 (Alexander Hamilton) (J. Cooke ed. 1961)). And "[w]hen citizens cannot readily identify the source of legislation or regulation that affects their lives, Government officials can wield power without owning up to the consequences." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). Because a branchless entity would undermine the accountability that the separation of powers demands, the Constitution requires that every entity exercising the authority of the federal government be accountable to a single branch.

Second, once the nature of a hybrid commission is determined, that constitutional location determines the roles that its executive and legislative members may play. To the extent that a commission exercises executive powers, for instance, agents of the Legislative Branch may not participate, even in an advisory capacity. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991) ("If the power is executive, the Constitution does not permit an agent of Congress to exercise it."); *Buckley v. Valeo*, 424 U.S. 1, 139 (1976) (per curiam) (holding that congressional appointees may "perform duties only in aid of those functions that Congress may carry out by itself, or in an area sufficiently removed from the administration and enforcement of the public law"); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827 (D.C. Cir. 1993) (observing that even in a purely advisory role, the presence of ex officio congressional agents on an Executive Branch commission violated the separation of powers); *see also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 160 n.95 (1996) ("*Separation of Powers*") ("[D]esignating a member of Congress to serve on a commission with any executive func-

tions, even in what was expressly labeled a ceremonial or advisory role, may render the delegation of significant governmental authority to the commission unconstitutional as a violation of the anti-aggrandizement principle." (citing *NRA Political Victory Fund*, 6 F.3d at 827)); *Common Legislative Encroachments*, 13 Op. O.L.C. at 251–52.

At the same time, if a commission is an arm of the Legislative Branch, then Executive Branch members may participate in an advisory role but, in that capacity, they do not cease to be subject to the supervision of the President. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) ("The entire 'executive Power' belongs to the President alone," and "lesser [executive] officers must remain accountable to the President, whose authority they wield."); *see also, e.g.*, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 31 (2008) ("*Direct Reporting Requirement*") ("[S]tatutes that interfere with the President's ability to supervise, directly or through subordinate officials, the Executive Branch's communications with Congress raise serious constitutional concerns."). As discussed below, the structure of the Cyberspace Solarium Commission presented a number of concerns about the roles Executive Branch members may play in the Commission, in light of its constitutional location.

Thus, the threshold question in evaluating the structure of a hybrid commission is determining the branch in which the entity resides. This approach finds consistent support in our precedents. In *Status of the Commission on Railroad Retirement Reform for Purposes of the Applicability of Ethics Laws*, 13 Op. O.L.C. 285 (1989) ("*Railroad Retirement Reform Commission*"), we considered the Railroad Retirement Reform Commission, whose members were appointed variously by the President, congressional leaders, and the Comptroller General (an agent of Congress). *Id.* at 286. The commission was charged with submitting a report to Congress and to the President with legislative recommendations about the railroad retirement system. *Id.* In view of the statute's dual-reporting requirement, the Commission was "vested with '[o]bligations to two branches,'" but the "presence of such dual obligations" did not prevent its "characterization . . . as part of one branch." *Id.* at 287 n.5 (quoting *Bowsher*, 478 U.S. at 746 (Stevens, J., concurring in the judgment)). The commission's obligation to report to Congress "without any prior review" by the Executive Branch would raise "serious constitutional questions," if

the commission fell within the Executive Branch. *See id.* at 287–88. We thus construed the statute's dual-reporting requirement "as contemplating that the Commission's report would be prepared principally for Congress' benefit" and concluded that the commission should be deemed to fall outside the Executive Branch for purposes of laws governing conflicts of interest and financial disclosure. *See id.* at 289–90.

We reached a similar conclusion with respect to the National Gambling Impact Study Commission, an advisory commission with six members appointed by Congress and three by the President. *Applicability of 18 U.S.C. § 208 to National Gambling Impact Study Commission*, 23 Op. O.L.C. 29, 29 (1999) ("*National Gambling Impact Study Commission*"). We emphasized that the commission performed only "information-gathering and advisory functions, which need not be performed by the executive branch." *Id.* at 30 n.2. And we concluded that, because a majority of the commissioners were congressionally appointed and the commission operated like a congressional committee, it was "part of the legislative branch." *See id.* at 30 n.2, 35.

In yet another opinion, we considered the location of the Native Hawaiians Study Commission in order to determine whether the Hatch Act applied to its chairman. *See Applicability of the Hatch Act to the Chairman of the Native Hawaiians Study Commission*, 6 Op. O.L.C. 292, 294 (1982) ("*Native Hawaiians Study Commission*"). The commission there consisted solely of presidential appointees, but it had been initially funded by Senate appropriations and had been "established to advise Congress rather than the President." *Id.* We recognized that "a commission may have dual responsibilities—as in this case, advisory to Congress, fact-finding and reporting to the President—without necessarily losing its character as an executive entity." *Id.* While finding that the structure presented a "difficult question," we concluded "that the circumstances viewed as a whole point[ed] to the Commission as an entity within the Executive Branch." *Id.* at 295.

Finally, on several occasions, this Office has considered the status of commemorative commissions, which have "representatives of multiple branches participating in ceremonial events," but which also must exercise executive authority in the course of administering the events in question. *Ronald Reagan Commission*, 33 Op. O.L.C. at 195. Those commissions have included members from the Legislative and Judicial Branches,

and in light of "ample historical precedent," we have accepted that "[i]t is not unconstitutional for such commissions to perform advisory functions." *Id.* at \*2 & n.1. But to the extent that these commissions perform executive functions—like "exercising operational control over a statutorily prescribed national commemoration"—then the participation of non-executive agents must end. *Id.* at \*3.

Thus, in 1984, we advised that the Commission on the Bicentennial of the Constitution, whose members included the Chief Justice and congressional leaders, should establish an "executive committee composed of all non-advisory members of the Commission . . . legally responsible for discharging the purely executive functions of the Commission" to accommodate separation of powers concerns. *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 207 (1984) ("*Bicentennial Commission*"). In 2010, we took the same course in advising that the Reagan Centennial Commission—a majority of which comprised members of Congress—could carry out the executive functions of planning and developing commemorative activities to honor President Reagan only by establishing a separate executive committee consisting solely of the Executive Branch members of the commission. *See* Memorandum for Robert F. Bauer, Counsel to the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Administration of the Ronald Reagan Centennial Commission* at 3–4 (May 7, 2010) ("Lederman Memo"). Following the approach of *Bicentennial Commission*, 8 Op. O.L.C. at 207, we construed the statute itself as "limit[ing] the exercise of the purely executive functions of the Commission to the five presidentially appointed commissioners" who would constitute the executive committee. Lederman Memo at 3 (internal quotation marks and citation omitted). With this executive committee in place, we advised that the full commission, with its majority of congressional appointees, was "limited to giving advice." *Ronald Reagan Commission*, 33 Op. O.L.C. at 200. In so doing, we essentially divided the Reagan Centennial Commission into two entities—one executive (consisting solely of Executive Branch representatives) and one advisory (consisting of both Executive Branch and Legislative Branch representatives). We therefore resolved the separation of powers concerns presented by such a ceremonial commission by cabining the functions of the full commission in a manner consistent with its implicit location in the Legislative Branch. *See also Administration of the John F. Kennedy Centennial Commission*,

41 Op. O.L.C. __, at *1 (Jan. 10, 2017) (recommending that the John F. Kennedy Centennial Commission adopt the same "structure used to carry out the functions of the Ronald Reagan Centennial Commission").

Previous practice therefore buttresses our conclusion: Every seemingly hybrid commission still must be situated in one and only one branch of our tripartite constitutional structure.[6]

## B.

We turn then to the Cyberspace Solarium Commission. Generally, "[t]he status within the government of an office created by statute is a matter of statutory interpretation." *Railroad Retirement Reform Commission*, 13 Op. O.L.C. at 285. But constitutional constraints prevent Congress from assigning purely executive duties to a legislative entity. *See Buckley*, 424 U.S. at 138–39. Because the FY 2019 NDAA did not specify where the Commission would reside, we consider the statutory context, the method of appointment of its members, and the powers that it exercises. Here, the relevant statutory indicia suggested that the Commission was located within the Legislative Branch.

---

[6] *See also Statement on Signing the National Defense Authorization Act for Fiscal Year 2020*, 2019 Daily Comp. Pres. Doc. No. 880, at 3 (Dec. 20, 2019) (observing with respect to a number of provisions that "establish[ed], reauthorize[d] or add[ed] to the authorities of hybrid commissions or boards," including the Cyberspace Solarium Commission, that commissions with Legislative Branch and Executive Branch appointees "separate from the executive branch" are simply "legislative branch entities"); *Statement on Signing the John S. McCain National Defense Authorization Act for Fiscal Year 2019*, 2018 Daily Comp. Pres. Doc. No. 533, at 2 (Aug. 13, 2018) ("FY 2019 NDAA Signing Statement") ("While I welcome the creation of this commission, these legislative branch appointees preclude it, under the separation of powers, from being located in the executive branch. My Administration accordingly will treat the commission as an independent entity, separate from the executive branch."); *Statement on Signing the National Defense Authorization Act for Fiscal Year 2017*, 2016 Daily Comp. Pres. Doc. No. 863, at 3 (Dec. 23, 2016) ("Because the commission contains legislative branch appointees, it cannot be located in the executive branch consistent with the separation of powers."); *Statement on Signing the Alyce Spotted Bear and Walter Soboleff Commission on Native Children Act*, 2016 Daily Comp. Pres. Doc. No. 695, at 1 (Oct. 14, 2016) ("While I welcome the creation of this Commission, it cannot be located in the executive branch consistent with the separation of powers because it includes legislative branch appointees[.]").

Multiple factors supported this determination. First, the Commission's membership structure suggested that it was located in the Legislative Branch, because "the majority of the Commissioners were congressionally appointed," *National Gambling Impact Study Commission*, 23 Op. O.L.C. at 30 n.2; *see also* FY 2019 NDAA § 1652(b), 132 Stat. at 2141. The presence of members of Congress on the Commission counseled strongly against treating it as an Executive Branch entity. *See NRA Political Victory Fund*, 6 F.3d at 827 (holding that two congressional agents could not serve, even as non-voting members, on the eight-member Federal Election Commission). Members of Congress may neither serve as officers of the United States, *see* U.S. Const. art. I, § 6, cl. 2, nor appoint such officers, *see id.* art. II, § 2, cl. 2. But even for commissions whose members lack the authority of officers of the United States—either because the Legislative Branch appointees perform only advisory roles or the commission itself lacks significant authority under the laws of the United States—locating a commission in the Executive Branch if Congress appoints a majority of the members would raise concerns of congressional aggrandizement and the blurring of the separation of powers. *See, e.g.*, *Separation of Powers*, 20 Op. O.L.C. at 160 n.95. The fact that members of Congress appoint a majority of the members of the Commission thus counseled strongly in favor of the conclusion that it is a Legislative Branch entity.

Second, the nature of the Commission's powers supported this conclusion. The Commission's principal duty was to prepare a report that "define[d] the core objectives and priorities" of national cyber policy and "consider[ed] possible structures and authorities that need to be established, revised, or augmented within the Federal Government" to defend the United States from cyber-attacks. FY 2019 NDAA § 1652(f)(1), (7), 132 Stat. at 2142–43. The Commission authored and submitted the report to Congress without any review from the Executive Branch, other than the four Executive Branch commissioners, who made up a minority of the Commission's fourteen members. *Id.* § 1652(k)(1), 132 Stat. at 2146. The procedure for publication and assessment of the Commission's report also suggested that the report was prepared "principally for Congress' benefit," *see Railroad Retirement Reform Commission*, 13 Op. O.L.C. at 289. While the FY 2019 NDAA required submission of the Commission's final report to several Executive Branch officials in addition to multiple congressional committees, *see* FY 2019 NDAA § 1652(k)(1), 132 Stat. at

2146, the executive officials were provided with the report merely to facilitate their own further responses to Congress. *See id.* § 1652(*l*), 132 Stat. at 2146. Both sets of recommendations—the Commission's report, and the analysis of the executive officials required to respond—were therefore ultimately for Congress's consideration. And any testimony or briefing on the Commission's report was also to be provided to Congress, *see id.* § 1652(k)(2)(B), 132 Stat. at 2146, again indicating that its recommendations were directed toward the Legislative Branch. In this way, the Commission was designed to "function[] much as a congressional committee does when conducting an investigation or drafting a legislative proposal based on the information it has gathered." *National Gambling Impact Study Commission*, 23 Op. O.L.C. at 35.

The Commission exercised no purely executive powers. Indeed, the Commission was expressly given the subpoena power of an agent of Congress; the FY 2019 NDAA authorized the Commission to issue subpoenas and provided that any actions in contempt of its subpoenas should be governed by the statutory procedures applicable to contempt of Congress, 2 U.S.C. §§ 192–194. FY 2019 NDAA § 1652(g)(1)(C). We have previously advised that "[i]f Congress intends [a] Commission to be part of the Executive Branch," then we would expect it to exercise the kind of civil enforcement power given to executive agencies, rather than the contempt powers of Congress. *See Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 204 (1983). The nature of the Commission's subpoena powers further confirmed that it was a legislative entity.

Finally, the FY 2019 NDAA exempted the Commission from the Federal Advisory Committee Act ("FACA") and Freedom of Information Act ("FOIA") requirements that typically apply to Executive Branch advisory commissions. FY 2019 NDAA § 1652(m), 132 Stat. at 2146. Ordinarily, "any committee" established by statute "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government" is subject to FACA. 5 U.S.C. app. § 3(2). FOIA likewise applies to most executive agencies. 5 U.S.C. § 552; *id.* § 551(1). Congress's choice to exempt the Commission from these requirements, while not dispositive, bore upon the interpretive question. Notably, in the very same act in which it created the Commission, Congress expressly located another advisory commission "in the executive branch" without excepting it from FACA and FOIA requirements. FY

2019 NDAA § 1051(a) (National Security Commission on Artificial Intelligence). That contrast provided an additional indication of the Commission's location in the Legislative Branch.

For the reasons set forth above, we concluded, and advised, that the Commission should be viewed as a Legislative Branch entity.

### III.

Our conclusion that the Commission was a Legislative Branch entity had separation of powers implications for the service of its Executive Branch members.[7] We advised that the Executive Branch officials serving on the Commission should act with one unified voice, subject to executive supervision, in advising the Commission. Although robust participation on a commission through the provision of advice, information, and staff and office resources is perfectly appropriate when that work promotes comity and is consistent with the interests of the Executive Branch, we advised that individual executive members should not participate in formal acts of the legislative commission, such as individualized voting or signing the Commission's final report; that they must preserve Executive Branch confidentiality interests when advising the Commission; and that they should comply with commission requests to share Executive Branch resources, outside of the statutory process, only to the extent that the provision of resources would be consistent with Executive Branch interests.

---

[7] The appointment by Congress of executive branch officers to a legislative entity presents a different constitutional question from when Congress vests the President with the power to appoint officials to serve on legislative commissions. *See, e.g.*, *Removal of Members of the Commission on Federal Laws for the Northern Mariana Islands*, 7 Op. O.L.C. 95, 102 (1983) (noting that, "[e]ven if we grant that the Commission is an arm of Congress," the President could still remove its members at will if Congress chose to vest appointment power in the President). Here, we addressed the separation of powers concerns that arose when a statute directed presidential appointees with pre-existing executive branch ties to serve ex officio in a position within the Legislative Branch. We did not disturb the long-standing historical practice of the President's appointing individuals to offices serving the entire Legislative Branch. *See, e.g.*, *Constitutionality of Bill Creating an Office of Congressional Legal Counsel*, 1 Op. O.L.C. Supp. 384, 389 (1976); *see also* 31 U.S.C. § 703(a)(1) ("The Comptroller General and Deputy Comptroller General are appointed by the President, by and with the advice and consent of the Senate."); 2 U.S.C. § 1801(a)(1) ("The Architect of the Capitol shall be appointed by the President by and with the advice and consent of the Senate for a term of 10 years.").

The Executive Branch officers did not serve on the Commission as independent actors, but as representatives of one Executive Branch, which is subject to ultimate supervision by the President. *See* U.S. Const. art. II, § 1, cl. 1 (vesting the President with "*[t]he* executive Power" (emphasis added)); *id.* art. II, § 3 (charging the President with the duty to "take Care that the laws be faithfully executed"); *see also, e.g., Seila Law*, 140 S. Ct. at 2197 ("The entire 'executive Power' belongs to the President alone"); *Myers v. United States*, 272 U.S. 52, 135 (1926) (highlighting that the President "may properly supervise and guide" subordinate officers "in order to secure . . . unitary and uniform execution of the laws"); *Printz v. United States*, 521 U.S. 898, 922 (1997) ("The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known."); *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring) ("[The Founders] sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many."); *Direct Reporting Requirement*, 32 Op. O.L.C. at 31 ("[S]tatutes that interfere with the President's ability to supervise, directly or through subordinate officials, the Executive Branch's communications with Congress raise serious constitutional concerns."). Therefore, in serving on a Legislative Branch entity, Executive Branch members on the Commission remained agents of the Executive Branch.

We addressed a somewhat analogous situation in connection with the detail of Executive Branch law enforcement agents to congressional committees. There, we observed that when executive officials work for a congressional committee, "[t]he pertinent issue . . . is whether the President's ability to supervise his subordinates in the performance of their executive branch functions is unconstitutionally impaired." *Detail of Law Enforcement Agents to Congressional Committees*, 12 Op. O.L.C. 184, 186 (1988) ("*Detail of Law Enforcement Agents*"). And we warned that congressional details potentially place executive officials "in the difficult position of serving two masters with conflicting interests—the legislative and executive branches." *Id.* at 184. To counteract these concerns, we advised that the Executive Branch members on detail could perform "only non-law enforcement, advisory functions," and even while performing those functions, they should "faithfully defend the interests of the execu-

tive branch" and preserve the confidentiality of Executive Branch information. *See id.* at 187–88.

So too here. In practice, the principle that Executive Branch officials must advance Executive Branch interests limited their participation in the Commission's work in several ways. First, the Executive Branch officials charged with assessing the Commission's final report were advised do so collectively, or at least in coordination with each other, rather than providing independent assessments in their separate capacities. And because members of the Commission were expected to cast their votes individually, we advised that the Executive Branch members should not vote on the final report or on commission decisions to issue subpoenas in the Commission's investigative capacity. Although the Executive Branch members could theoretically have adopted and advanced common positions with respect to matters on which they were expected to vote, the need for the Commission to release its report promptly made it impracticable for them to engage in the kinds of consultations necessary to do so.

This limitation, however, did not necessarily preclude Executive Branch members from robust participation in the formulation of the report. Just as Executive Branch officials may perform "advisory or research" functions while on detail to a congressional committee, *Detail of Law Enforcement Agents*, 12 Op. O.L.C. at 186, they could advise and provide information, expertise, and substantial resources to the Commission. But such input had to be consistent with the Executive Branch's understanding of its own interests. And any contributions to, and assessments of, the Commission's report had to be subject to the supervision of others in the Executive Branch. *Cf. Separation of Powers*, 20 Op. O.L.C. at 174–75 (objecting to requirements that reports be simultaneously submitted to the Executive and Legislative Branches, because such requirements "increase congressional leverage on the President and other officials of the executive branch" and thus potentially "interfer[e] with the President's fulfillment of his obligations under the Take Care Clause"). We therefore advised that the Executive Branch members could serve an advisory role and articulate a uniform position on the Commission's work, but they should not formally vote or sign the legislative commission's final report. We further advised that the Executive Branch officers assigned the statutory role of providing assessments of the Commission's report to Congress, *see* FY 2019 NDAA § 1652(*l*), 132 Stat. at 2146, did not act in their individual capacities, but rather remained subject to the

ordinary mechanisms by which the President supervises and coordinates the position of the Executive Branch.

In addition, we advised that all Executive Branch members and staff should maintain the confidentiality of Executive Branch information when sharing their information and expertise with the Commission. Executive agencies should treat a legislative commission's requests for confidential Executive Branch information in the same way that the Executive Branch generally responds to requests for information from Congress. Like a congressional committee, the Commission was empowered to obtain the information necessary for its work through hearings, voluntary requests, and subpoenas. *See id.* § 1652(g)(1)(A)–(C), 132 Stat. at 2143. Executive agencies should similarly seek to accommodate legitimate requests consistent with the established accommodation process. *See, e.g.*, *Am. Tel. & Tel. Co.*, 567 F.2d at 127 (requiring each branch to "seek optimal accommodation through a realistic evaluation of [their respective] needs . . . in the particular fact situation"); *Attempted Exclusion of Agency Counsel from Congressional Depositions*, 43 Op. O.L.C. __, at *19 (May 23, 2019) (describing "the constitutional balance" of providing Congress with information essential to oversight while preserving Executive Branch constitutional prerogatives); *Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *5 n.6 (Jan. 18, 2017); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (referring to this practice with approval and noting ruefully that "Congress and the President [had] maintained this tradition of negotiation and compromise—without the involvement of this Court—until the present dispute"). And while the Commission may have had a legitimate need to obtain classified or sensitive national security information for its work, its requests needed to be measured like any other Legislative Branch request for sensitive information, and they remained subject to the President's ultimate control over such information. *See, e.g.*, *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988).

Finally, Executive Branch entities were advised that they should treat the FY 2019 NDAA's provisions requiring them to provide administrative assistance to the Commission (in the form of resources such as office space, computer facilities, and staff) as discretionary. Congress, of course, may appropriate funds to itself for the performance of its duties

and the support of its agents. The anti-aggrandizement principle of the separation of powers, however, prohibits a congressional body from using any means other than the enactment of legislation to order the Executive Branch to execute legislation. *See Bowsher*, 478 U.S. at 733 ("[O]nce Congress makes it choice in enacting legislation, its participation ends."). As a Legislative Branch entity, the Commission could not be given the power to compel Executive Branch departments to provide office space, administrative support, and supplies on a nonreimbursable basis, *see* FY 2019 NDAA § 1652(g)(4), 132 Stat. at 2144.[8] *See, e.g.*, Letter for Heidi Heitkamp & Lisa Murkowski, U.S. Senate, from Stephen E. Boyd, Assistant Attorney General, Office of Legislative Affairs, *Re: Implementation of the Alyce Spotted Bear and Walter Soboleff Commission on Native Children* at 2 (Aug. 10, 2018) ("In order to avoid a constitutional issue, the Department will treat as permissive the directives to provide administrative support and detailees[.]"). Accordingly, we advised that the Executive Branch should provide the Commission with Executive Branch resources—such as office space, access to computer networks, and e-mail addresses—only if it concluded that providing access to a resource would sufficiently advance Executive Branch interests to outweigh any potential risks from the resulting commingling of executive and legislative resources.

More specifically, we advised that the sharing of Executive Branch computer networks or the use of Executive Branch e-mail addresses to conduct commission business should be done in a manner that would not

---

[8] Several of the FY 2019 NDAA provisions providing for commission support used the mandatory "shall," rather than the discretionary "may." *See, e.g.*, FY 2019 NDAA § 1652(g)(3)(B), 132 Stat. at 2144 (providing that executive entities "*shall, to the extent authorized by law*, furnish" information to the Commission (emphasis added)); *id.* § 1652(g)(4)(A), 132 Stat. at 2144 ("The Secretary of Defense *shall provide* to the commission, on a nonreimbursable basis, such administrative services, funds, staff, facilities, and other support services *as are necessary for the performance of the Commission's duties*[.]" (emphases added)); *id.* § 1652(g)(4)(D), 132 Stat. at 2144 ("The Commission *shall receive* the full and timely cooperation of any official, department, or agency of the United States Government *whose assistance is necessary, as jointly determined by the [Commission] co-chairs*[.]" (emphases added)). But these provisions nonetheless authorized officials to exercise some judgment in determining whether certain resources would be made available, based on an analysis of whether the support was "necessary" or "authorized by law." To the extent that those provisions denied such discretion, they were required to yield to constitutional separation of powers principles.

suggest an Executive Branch imprimatur. And if administrative assistance was to take the form of detailing personnel to the Commission, executive agencies were encouraged to consider whether the Executive Branch benefits to be gained by the personnel's service to the Commission would be sufficiently significant to outweigh any potential confidentiality or accountability considerations raised by their service to a legislative entity. *See Detail of Law Enforcement Agents*, 12 Op. O.L.C. at 185 (providing that, in detailing law enforcement agents to congressional committees on a voluntary basis, the Department should consider "whether the benefits to be gained by the law enforcement agencies are sufficiently extraordinary to outweigh the separation of powers and ethical concerns raised by the detail").

## IV.

For the reasons set forth above, we concluded that the Commission had to be located within one branch of the tripartite federal constitutional structure. In addition, we advised that the statutory structure and context indicated that the Commission was most appropriately viewed as a Legislative Branch entity. Accordingly, as a constitutional matter, the Executive Branch members of the Commission were limited in the ways they could participate in the Commission's work; they were required to perform their commission responsibilities as Executive Branch representatives, consistent with the Executive Branch's confidentiality and policy interests.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
